278 F.2d 72
 Otis E. JONES and Betty Jo Jones, infants, by Leora Jones, their mother and next friend, et al., Appellants,
v.
SCHOOL BOARD OF CITY OF ALEXANDRIA, VIRGINIA, a body corporate, and T. C. Williams, Division Superintendent of Schools of the City of Alexandria, Virginia, Appellees.
 No. 7897.
 United States Court of Appeals Fourth Circuit.
 Argued October 13, 1959.
 Decided April 20, 1960.
 
 Frank D. Reeves, Washington, D. C. (Oliver W. Hill, Richmond, Va., Otto L. Tucker, Alexandria, Va., Spottswood W. Robinson, III, Richmond, Va., and James M. Nabrit, III, Washington, D. C., on brief), for appellants.
 John Barton Phillips, Alexandria, Va., A. S. Harrison, Jr., Atty. Gen., of Virginia, (Earl F. Wagner, Alexandria, Va., and R. D. McIlwaine, III, Asst. Atty. Gen., of Virginia, on brief), for appellees.
 Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.
 PER CURIAM.
 
 
 1
 The applications of fourteen Negro children, through their parents, to the School Board of the City of Alexandria, Virginia, to be transferred from colored to white schools in the city gave rise to this litigation. The School Board rejected all of the applications and the plaintiffs brought this suit, alleging that the actions of the Board had been taken pursuant to the policy of segregating the races in the public schools in the city and praying that the Board be enjoined from pursuing this policy and also for further relief. After a hearing the District Judge ordered that nine of the students should be admitted to the schools of their choice at the opening of the schools on February 10, 1959, and refused the suggestion of the defendants that the admissions be deferred until the commencement of the next session of the schools in September, 1959. The judge, however, denied the motion of five of the applicants for further relief on the ground that they were disqualified to enter the desired school because of residence or academic deficiency. The Board did not appeal from the order admitting the nine children and the case comes to this court only on the appeal of the remaining five children.
 
 
 2
 Common to all of the cases is the contention that the action of the School Board in rejecting the applications was based solely on racial grounds. They complain of the formulation and enforcement of a resolution adopted by the School Board on October 28, 1958, governing the assignment of pupils applying for transfer or initial enrollment in the public schools of the city, under which the School Board purported to act in passing upon the application for the transfers in suit.[1] The gist of the complaint is that the action of the School Board was designed and applied in such a way so as to continue the existing segregated school system, thus depriving the Negro children of their constitutional rights.
 
 
 3
 The resolution of the Board declared that the plan would be administered on a racially nondiscriminatory basis and that certain criteria would be considered in making the assignment of any pupil to any of the public schools of the city. These criteria were described as follows in the opinion of the District Judge:
 
 
 4
 "* * * Its factors were: (1) `Relation of residence location of the pupil with reference to schools, or school, applied for.'; (2) `State of enrollment conditions in the schools concerned in any case, or cases, under discussion.'; (3) `Academic achievement and mental capacity as these factors enter into conclusions on requests for entry or transfer.'; (4) `Factors involving the health and/or well-being of the applicant which may have a bearing on the request from him.'; (5) `Any factors which might affect the mental or emotional stability of the applicant so much as to become pertinent in placement determination.'; and (6) `Is the applicant a bona fide resident of the city and actually entitled to attend school here.'
 
 
 5
 "Factors 4 and 6, supra, were not used by the Board at all. Mental or emotional stability, factor 5, invoked by the Board in every case, has been discarded by the court throughout, for under the evidence No. 5 is not apposite to any of the applications. This leaves for consideration Nos. 1, 2 and 3 pertaining, respectively, to residence-school locations, school building capacities and academic-mental attainments."
 
 
 6
 The District Judge also found, as to the children who were refused admission to white schools on the basis of overcrowding, that the ratio of enrollment to capacity in the schools applied to was not so great as to justify any exclusion for the proposed slight increase. Of the five appellants, whom the judge found disqualified under the above criteria, two were denied transfer on the basis of their mental capacity and attainment and three because they resided closer to the Negro high school they had been attending than to the white school to which they sought enrollment. Therefore, it is only the scholarship and residence criteria with which we are concerned in this appeal.
 
 
 7
 It is not contended by the appellants that residence and intelligence or scholarship attainment tests may never be properly applied in determining the particular schools that children shall attend. Such criteria are in effect in many school systems throughout the country. In the absence of a showing that these factors are used in such a way as to deprive individuals of their consitutional rights, they are, of course, not objectionable on constitutional grounds. See Shuttlesworth v. Birmingham Board of Education, D.C., 162 F.Supp. 372, affirmed 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed. 2d 145. The objection in the instant case is that the criteria were applied in such a way as to circumvent the constitutional requirement that a state shall not maintain its school system on a racially segregated basis. If this were true, it would be dispositive of the case and completely justify the appeal. However, the peculiar facts shown by this record do not sustain the charge. When the resolution was adopted the administrative officials of the public schools of Virginia were confronted with an extremely difficult situation and the School Board of Alexandria did not immediately place the resolution or the criteria into effect. To have done so would have occasioned the seizure and closure of each school to which biracial assignments were made. Virginia's "Massive Resistance Laws" had not then been declared unconstitutional. They required Virginia's Governor to seize and close any school to which biracial assignments were made, and this he had done in Norfolk.[2] It was only after those laws were declared unconstitutional by Virginia's Supreme Court of Appeals[3] and by a federal three-judge district court[4] that the school board had the power to operate schools administered on a racially nondiscriminatory basis. Those decisions did not come down until January 19, 1959.
 
 
 8
 A hearing was held in this case only four days later, on January 23, 1959, during which the District Judge ordered the School Board to consider and act upon the applications of the fourteen plaintiffs. On the same day, the Board placed in effect the resolution of October 28, 1958, a step which had been within its effective power for only three days.
 
 
 9
 The testimony shows that these fourteen were the only applications for transfer or enrollment to come up during the week which elapsed between January 23, 1959, and the final hearing in this case on January 30, 1959. While it appears that there were some transfers and enrollments after October 28, to which the criteria of the plan were not applied, all of those were processed prior to the activation of the plan on January 23, 1959. Since its activation, a selective exemption from the criteria of some applications for transfer, or of some initial enrollments in the public schools, is not shown on this record. If this were shown, then we would be faced with a different case than is now before us.
 
 
 10
 School officials testified that when the plan was activated it applied prospectively to all pupils. The resolution provides for its prospective use in connection with all applications for "transfer, enrollment or placement." School principals were informed by a directive that thenceforth the plan applied to all "transfers,"[5] and we do not understand that the omission of the words "enrollment or placement" was intended to restrict the application of the criteria to narrower limits than specified in the resolution. We cannot say on this record it will not be applied to enrollments as well as transfers, and to white as well as Negro. The fact that the plan was first applied, within three days after the clarifying decisions, to the applications of these fourteen Negro pupils creates no constitutional objection. Every plan and every change in plans must have an initial application. The first pupil or group of pupils to which it is applied has not been thought exempt from its operation.[6]
 
 
 11
 Obviously the maintenance of a dual system of attendance areas based on race offends the constitutional rights of the plaintiffs and others similarly situated and cannot be tolerated. It is not mentioned in the plan of the Alexandria School Board, and we may assume, in the absence of more evidence than the activation of the plan in the present record affords us, that the continuance of the dual system is not contemplated. In order that there may be no doubt about the matter, the enforced maintenance of such a dual system is here specifically condemned. However, it does not follow that there must be an immediate and complete reassignment of all the pupils in the public schools of Alexandria. On the other hand, the admonition in Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, must be borne in mind in delineating the affirmative duty resting upon the school authorities. The Court said, 358 U.S. at page 7, 78 S.Ct. at page 1404:
 
 
 12
 "Under such circumstances, the District Courts were directed to require `a prompt and reasonable start toward full compliance,' and to take such action as was necessary to bring about the end of racial segregation in the public schools `with all deliberate speed.' Ibid. Of course, in many locations, obedience to the duty of desegregation would require the immediate general admission of Negro children, otherwise qualified as students for their appropriate classes, at particular schools. On the other hand, a District Court, after analysis of the relevant factors (which, of course, excludes hostility to racial desegregation), might conclude that justification existed for not requiring the present nonsegregated admission of all qualified Negro children. In such circumstances, however, the courts should scrutinize the program of the school authorities to make sure that they had developed arrangements pointed toward the earliest practicable completion of desegregation, and had taken appropriate steps to put their program into effective operation. It was made plain * * * that only a prompt start, diligently and earnestly pursued, to eliminate racial segregation from the public schools could constitute good faith compliance. State authorities were thus duty bound to devote every effort toward initiating desegregation and bringing about the elimination of racial discrimination in the public school system."
 
 
 13
 The two criteria of residence and academic preparedness, applied to pupils seeking enrollment and transfers, could be properly used as a plan to bring about racial desegregation in accordance with the Supreme Court's directive. The record in this case is insufficient in demonstrating that the criteria were not so applied. On the other hand, these criteria could be used in such a way as to be a vehicle for frustrating the constitutional requirement laid down by the Supreme Court. If this is later shown to be the case, then the action of the School Board would not escape the condemnation of the courts. If the criteria should be applied only to Negroes seeking transfer or enrollment in particular schools and not to white children, then the use of the criteria could not be sustained. Or, if the criteria are, in the future, applied only to applications for transfer and not to applications for initial enrollment by children not previously attending the city's school system, then such action would also be subject to attack on constitutional grounds, for by reason of the existing segregation pattern it will be Negro children, primarily, who seek transfers.
 
 
 14
 The appellants' contentions are based, not so much upon what is shown to have happened, as upon what they fear will happen. We are mindful that in judging the action taken by the Board in these cases, so soon after the restoration of its control over the school system, we are afforded no context in which to test the Board's purposes. In these circumstances we are permitted to accept at full face value its disavowal of any discriminatory motivations. Should the record in a future case supply evidence that the Board has in fact employed the criteria for racial discrimination, its actions would be open to attack upon constitutional grounds. In the present instance the judgment is
 
 
 15
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The Legislature of Virginia had enacted a Pupil Placement Act, Code 1950, § 22-232.1 et seq., but this was inoperative and ineffective because other state statutes required the Governor to close the schools of any locality in which any integration of the races occurred. The institution of the pending suit led the Board to act upon its own authority
 
 
 [2]
 See, generally, James v. Almond, D.C. E.D.Va., 170 F.Supp. 331
 
 
 [3]
 Harrison v. Day, 200 Va. 439, 106 S.E. 2d 636. See also Hamm v. County School Board of Arlington County, 4 Cir., 264 F.2d 945, where we pointed out that the threat of closing the schools, which then hung over the County School Board, prevented them from acting with the same freedom and independence as they enjoyed after the two decisions last cited were handed down
 
 
 [4]
 James v. Almond, D.C.E.D.Va., 170 F. Supp. 331
 
 
 [5]
 The resolution of October 28, 1958, in the paragraph relating to academic achievement and level of mental maturity of pupils applying for enrollment or transfer suggests that these tests should be applied in unusual circumstances and specific reference is made to the applications of the fourteen Negro children as involving the unusual circumstance of seeking admission to schools attended only by children of the opposite race, and from this it is argued that the Board intended to apply the tests to colored children only. The resolution, however, has not been so interpreted by the school officials. The Superintendent of the Alexandria schools testified that the principals of the schools were advised that in the future and from that time on applications for transfer would have to be handled through the administrative office on the basis of the six criteria. The principals were not advised that the criteria applied to colored children only
 
 
 [6]
 See Shuttlesworth v. Birmingham Board of Education, D.C.N.D.Ala., 162 F.Supp. 372, affirmed 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145; Parham v. Dove, 8 Cir., 271 F.2d 132; Carson v. Warlick, 4 Cir., 238 F.2d 724