William Henry NORWOOD et al., Appellants,

v.

Everett TUCKER, Jr., et al., Appellees.

No. 16586.

United States Court of Appeals Eighth Circuit.

March 2, 1961.

---

Wiley A. Branton, Pine Bluff, Ark., for appellants and Thurgood Marshall and James M. Nabrit, III, New York City, were with him on the brief.

Herschel H. Friday, Jr., Little Rock, Ark., for appellee, and Robert V. Light, and Howard Cockrill, Little Rock, Ark., were with him on the brief.

Before WOODROUGH, VAN OOSTERHOUT, and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

The plan for integration of the public schools in Little Rock, Arkansas, which was adopted by the Board of Education May 24, 1955, approved by the United States District Court in Aaron v. Cooper, 143 F.Supp. 855, on August 27, 1956, and affirmed by this Court April 26, 1957, 243 F.2d 361, is once more the subject before us on appeal.[1]

1. See Aaron v. Cooper, D.C., 156 F.Supp. 220, enjoining Governor and other offi-

cials of the State of Arkansas from, inter alia, obstructing or preventing

Appellants are several of the original plaintiffs in Aaron v. Cooper, 143 F.Supp. 855, supra, a class action, and a number of Negro students who, upon motion in the trial court, were allowed to intervene. It appears that one of the intervenors has not joined in this appeal. Hereinafter, appellants will be referred to as "plaintiffs." The appellees are the Little Rock School District, Mr. Powell, Superintendent of Schools, and members of the Little Rock School Board serving during the 1959–60 school year, who were substituted for the members made defendants in the original action. For history and discussion of the tenure of various members of the Board, see opinion of the trial court, Aaron v. Tucker, D.C., 186 F.Supp. 913, at page 920. The appellees will hereinafter be referred to collectively as "defendants," or "the Board."

On August 8, 1959, plaintiffs filed a "motion for further relief" on behalf of themselves and all members of the class which they represent. Therein it was alleged that Negro students registered at Central, Technical and Hall High Schools for attendance at those schools during the 1959–60 school year, in accordance with school zones or attendance areas prescribed by defendants, but were notified on August 3, 1959, that they would not be admitted to those schools, but had been assigned to the Horace Mann High School.

In summary, the motion averred that plaintiffs, because of their race or color, were denied admission to the schools they are entitled to attend under a plan of desegregation presented by the Board and affirmed by court decree, thereby being denied equal protection of the laws in violation of the Fourteenth Amendment. The motion incorporated the legal proceedings to which we have already alluded in the margin under footnote 1, and alleged that the defendants are required to desegregate the schools in Little Rock in accordance with the court-approved plan, which fixes no qualifications for attendance other than the requirements which apply to all students, i. e., that they live within the school attendance zones or area of the schools which they desire to enter and attend.

Relief was sought to restrain defendants from refusing to admit plaintiffs and intervenors and all other Negro students who present themselves for admission to such Little Rock senior high schools as they may be entitled to enter pursuant to the prescribed school attendance areas.

Defendants' response to the motion is incorporated in the trial court's opinion, Aaron v. Tucker, D.C., 186 F.Supp. at pages 915–919. Therein, and at the trial, defendants advanced the position that after the action closing the schools had been declared unconstitutional (Aaron v. McKinley, D.C., 173 F.Supp. 944, supra), the high schools in Little Rock have been operated on a non-discriminatory basis, and in accordance with the pupil assign-

Negro students from attending Little Rock Central High School, affirmed sub. nom. Faubus v. United States, 8 Cir., 254 F.2d 797, certiorari denied 358 U.S. 829, 79 S.Ct. 49, 3 L.Ed.2d 68; Aaron v. Cooper, D.C., 163 F.Supp. 13, suspending operation of plan of integration until mid-semester of 1960–1961 school year, reversed Aaron v. Cooper, 8 Cir., 257 F.2d 33, affirmed sub. nom. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1399, 3 L.Ed.2d 3; Aaron v. Cooper, 8 Cir., 261 F.2d 97, after Board had purportedly leased school properties to private organization, directing entry of order enjoining school board members from engaging in any acts which are capable of serving to impede, thwart or frustrate

execution of the integration plan, and requiring them to take such affirmative steps as directed by the district court to facilitate and accomplish integration of Little Rock schools; Aaron v. Cooper, D.C., 169 F.Supp. 325, entering order in accordance with opinion and mandate in Aaron v. Cooper, 8 Cir., 261 F.2d 97; Aaron v. McKinley, D.C., 173 F.Supp. 944 (3-Judge court) holding unconstitutional Act 4 of the Second Extraordinary Session of the Sixty-first General Assembly of Arkansas for the year 1958, under which high schools in Little Rock were closed, affirmed sub. nom. Faubus v. Aaron, 361 U.S. 197, 80 S.Ct. 291, 4 L. Ed.2d 237.

ment laws of Arkansas (§§ 80–1519 through 80–1534, and 80–1234, Ark. Stats., 1947, Vol. 7, 1960 Replacement) [2] and Regulations adopted pursuant thereto.

After a trial of the issues on March 22 and 23, 1960, plaintiffs were denied any relief, their motion was dismissed, and the trial court found there was no reason for the court to retain jurisdiction of the cause since enforcement of the asserted rights is personal to those who may claim a violation thereof. Aaron v. Tucker, D.C., 186 F.Supp. at page 933.

Plaintiffs present two basic contentions: (1) that denial of injunctive relief permits defendants to unjustifiably modify the court-approved desegregation plan and impairs rights of plaintiffs secured by the plan and the Fourteenth Amendment; (2) that denial of injunctive relief permits continuation of racially discriminatory policies and procedures which tend to preserve segregation in violation of rights protected by the Fourteenth Amendment. We discuss these in the order presented.

In substance, the basic plan for integration of the Little Rock schools provides for a three-step program. Phase 1, encompassing the senior high school level, grades 10 to 12, was scheduled to begin in the fall of 1957. Because of a building program then in progress, it was estimated that two to three years would be required to complete segregation at this level. Phase 2, at the junior high school level, grades 7 to 9, was to start upon completion of the first phase of integration, and the third step, at the elementary level, grades 1 to 6, was to start after successful completion of phases 1 and 2, with integration to be completed not later than 1963.

The main point of disagreement is whether the plan contemplated that the Little Rock School District would be divided into separate attendance areas and that attendance would depend on residence alone. The original plan, together with the record of trial proceedings leading to court approval thereof, conclusively demonstrate that the district was to be divided into attendance areas. On May 20, 1954, three days after the Supreme Court rendered its decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, the school board formally stated that it would "(d)evelop school attendance areas consistent with the location of white and colored pupils with respect to present and future physical facilities in Little Rock School District." In approving the plan, the district court observed, Aaron v. Cooper, D.C., 143 F.Supp. at page 861, supra:

"In accord with this plan the Board has completely reorganized its attendance areas. At present Central and Technical High Schools have a city-wide attendance area for white students, and Horace Mann High School has a city-wide attendance area for Negro students. Under the new plan Technical High School would remain a city-wide school for all students, but Central and Horace Mann High Schools, together with the new West End High School (Hall), would each have separate attendance areas. At this time there are no Negro students residing in the West End High School attendance area, but there are both Negro and white students residing in the Central and Horace Mann High School districts."

If any question existed as to whether the established attendance areas were within the contemplation of the plan, it was completely dispelled by school board action. Following approval of the plan, the school board divided the district

---

2. §§ 80–1519 through 80–1524 constitute the 1956 Act; §§ 80–1525 through 80–1534 and 80–1234 constitute the second Act of 1959. Although the 1956 legislation has not been expressly repealed, see Parham v. Dove, 8 Cir., 271 F.2d 132, note 3 at page 134, the parties have proceeded under the 1959 Act, and for the purposes of this opinion there is no controlling difference in the substantive material of the two Acts.

into four senior high school attendance areas as follows: Technical High School, limited to teaching trades, was given a city-wide attendance area; Area 1, Horace Mann High School, an all-Negro school, was assigned a territory composed generally of the eastern part of the district; Area 2, Central High School, formerly an all-white institution, was assigned an area generally in the central part of the district, and Area 3, Hall High School, the new school, was assigned a territory composed generally of the northern and northwestern parts of the district. In this setting, plaintiffs' position, succinctly stated, is, every Negro child has the unqualified right to attend the high school situated in the area of his residence, e. g., a Negro child living in the Central High area is entitled to attend Central, without application of assignment or placement criteria.

While we are convinced that assignment on the basis of pupil residence was contemplated under the original plan of integration, it does not follow that the school officials are powerless to apply additional criteria in making initial assignments and re-assignments. We recognized in Aaron v. Cooper, 257 F.2d at page 34, supra, that implicit in the plan was consideration of criteria other than residence.

It must be remembered that following the approval of the original plan, the State of Arkansas enacted two pupil assignment or placement statutes, one in 1956 and the Act of 1959 under which the Board is now proceeding. This legislation is clearly designed to invalidate the practice of enrollment according to residence alone. Section 80–1525 (Acts 1959 No. 461) provides in part:

"The legislature also recognizes the necessity for a procedure for the analysis of the qualifications, motivations, aptitudes and characteristics of the individual pupils for the purpose of placement, both as a function of efficiency in the educational process and to assure the maintenance of order and good will indispensable to the willingness of the citizens and taxpayers of the State of Arkansas to continue a public educational system as a necessary public function, and also a vital part of the sovereignty and police power of the State of Arkansas. * * *

"Pending further studies and recommendations by the school authorities the legislature considers that any general or arbitrary reallocation of pupils heretofore entered in the public school system according to any rigid rule of proximity of residence or in accordance solely with request on behalf of the pupil would be disruptive to orderly administration, tend to invite or induce disorganization and impose an excessive burden on the available resources and teaching and administrative personnell [personnel] of the schools."

The Arkansas pupil assignment laws have been ruled to be facially valid by this court. See Parham v. Dove, 8 Cir., 271 F.2d 132, and Dove v. Parham, 8 Cir., 282 F.2d 256. Thus, even though it may be said that under the original plan assignments were to be made solely on the basis of residence of the pupils, we must rule that the Board was not rendered without authority to modify, or, more accurately stated, to supplement such plan by applying the factors and criteria set forth in the assignment laws, so long as they are not applied in an artificial manner and for the purpose of continuing segregation in the Little Rock schools. In the final analysis, the controlling question for determination is whether the constitutional rights of children not to be discriminated against in school admission on grounds of race or color, have been violated. See Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 3 L.Ed.2d 5.

To properly evaluate the Board's actions preceding the 1959–60 school term, and to make determination as to whether, as urged by the Board, it proceeded in good faith, recognizing its duties as above outlined, we give attention to the controlling principles of law.

While proper application of pupil assignment laws may be an effective tool to accomplish racial desegregation in an orderly manner, in accordance with the Supreme Court's directive, we also recognize that there is nothing in the Arkansas pupil assignment law or the implementing resolution "clearly inconsistent with a continuing policy of compulsory racial segregation," Gibson v. Board of Public Instruction, Dade County, Fla., 5 Cir., 272 F.2d 763, 766; Mannings v. Board of Public Instruction, 5 Cir., 277 F.2d 370, 372, and, the criteria which are a part of the Act here could be used in such a way as to be a vehicle for frustrating the constitutional requirement laid down by the Supreme Court. In Dove v. Parham, 8 Cir., 282 F.2d at page 258, supra, we considered the validity of the Arkansas law, and stated:

"The recognition of facial validity which we thus gave to the statute was on the basis of it constituting a 'legislative non-racial scheme', intended to serve in effecting student location through 'overall pattern', instead of by promiscuous result."

We have counseled in explicit language that the Act cannot "be made to serve through artificial application, as an instrument for maintaining * * * a system of racial segregation." Parham v. Dove, 271 F.2d at page 136, supra. See also, Shuttlesworth v. Birmingham Board of Education, D.C.N.D.Ala., 162 F.Supp. 372, affirmed 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145, and Jones v. School Board of City of Alexandria, Virginia, 4 Cir., 278 F.2d 72, at pages 75 and 77, where this pertinent comment appears:

"Such criteria [residence and intelligence or scholarship attainment] are in effect in many school systems throughout the country. In the absence of a showing that these factors are used in such a way as to deprive individuals of their constitutional rights, they are, of course, not objectionable on constitutional grounds.

* * * * * *

"If the criteria should be applied only to Negroes seeking transfer or enrollment in particular schools and not to white children, then the use of the criteria could not be sustained. Or, if the criteria are, in the future, applied only to applications for transfer and not to applications for initial enrollment by children not previously attending the city's school system, then such action would also be subject to attack on constitutional grounds, for by reason of the existing segregation pattern it will be Negro children, primarily, who seek transfers."

With the foregoing in mind, we revert to the factual situation. It may be conceded that the defendants, all public spirited citizens, have devoted much time, at great personal sacrifice, to the operation of the schools of Little Rock, under the most adverse conditions. We need not recite in detail the events leading up to the summer of 1959, for this information is readily available to interested parties in the numerous reported cases cited in the margin at footnote 1. It is sufficient to say that the Board was required to work against a background which included past violent opposition on the part of many citizens of the city and officials of the State of Arkansas to integration of schools on any level, or to any degree; that during the 1957–58 year, the schools were operated with United States troops in attendance to secure order. Aaron v. Cooper, supra, 257 F.2d 33. During the 1958–59 school year, the high schools were closed pursuant to an Act of the Arkansas legislature and an order of the Governor of the State, and it was not until June 18, 1959, that this Act was declared unconstitutional. Aaron v. McKinley, 173 F.Supp. 944, supra. There had been much public dissatisfaction with, and dissension between,

prior members of the Board and three members who are defendants here had successfully survived a recall election; there was extensive revision of administrative personnel, including a new superintendent of schools; the inexperienced Board was confronted with the difficult task of opening the high schools, hiring new teachers, purchasing supplies and handling other problems common to the operation of all the schools of Little Rock. During the summer of 1959 the Board held meetings almost every day, many lasting into the evening hours, and their task was further complicated by tear gas bombing while they were actually in session on August 27, and by dynamiting of the school administration building on the evening of September 8. It is readily apparent that their service as members of the Little Rock School Board was at best a thankless task and that it was performed at great personal sacrifice.

However, be that as it may, the question remains—were plaintiffs herein subjected to discriminatory and unequal treatment in violation of their constitutional rights? Conceding that individual members of the Board did act in good faith, we must reiterate our statement in Dove v. Parham, 282 F.2d at page 261, supra: " * * * we * * * have regarded the board as having been acting with subjective good faith. The question here, however, is not state of mind but required action. Required action is measurable only by objectivity." In reviewing the actions of the Board objectively, the facts belie the assertion that the schools were operated in a non-discriminatory manner. At some length, we review these facts, which speak for themselves.

On July 14, 1959, shortly after the school closing act was declared unconstitutional, a decision was reached to open the high schools with all possible speed, and to that end a public announcement was made for plans for school registration on July 21 through July 24. As to place of registration, students were advised as follows:

"Tech High: All students desiring to attend Tech High will register there.

"Hall High: All students in the Hall High Attendance Area will register at Hall High, except that Negro students in the Hall High Attendance Area who elect to do so may register at Horace Mann High School.

"Central High: All students in the Central High Attendance Area will register at Central High, except that Negro students in the Central High Attendance Area who elect to do so may register at Horace Mann High School.

"Horace Mann High School: All students in the Horace Mann High School Attendance Area will register at Horace Mann High School, except that white students in the Horace Mann Attendance Area who elect to do so may register at Central High School."

On that same date, the Board released a statement to the public, advising of the plan to open the schools, observing as follows:

"Each and every member of the Little Rock Board of Education, if given a choice, would operate our schools completely segregated. However, if no choice is offered, we will not abandon free public education in order to avoid desegregation. To date neither Governor Faubus nor anyone else has come forward with any method whereby we may maintain compulsory segregation and still operate our public high schools. If Governor Faubus and his attorneys have conceived of such a plan, we earnestly request that he communicate such plan to us immediately. We stand ready at all times to confer with him on this matter."

Registrations were held as scheduled, and each student completed a form giving his name, address, occupation of parents, past school history, and indicating subjects he desired to pursue. No provision was made for an indication of school preference. The school attendance areas mentioned are illustrated by a plat, an exhibit before the court, and generally, these areas are the same as originally established following the initial adoption of the plan. General high school curricula is offered at Mann, Central and Hall, and only trades are taught at Technical, which, during 1959–60 had an enrollment of 175 white male students. The plat in exhibit reflects the residential situation with respect to the schools as follows:

| Area | Grade | White | Negro | Totals |
|---|---|---|---|---|
| Area 1—Horace Mann | 10 | 82 | 181 | 263 |
| | 11 | 62 | 116 | 178 |
| | 12 | 58 | 80 | 138 |
| Totals...... | | 202 | 377 | 579 |
| Area 2—Central High | 10 | 520 | 172 | 692 |
| | 11 | 485 | 127 | 612 |
| | 12 | 407 | 50 | 457 |
| Totals...... | | 1412 | 349 | 1761 |
| Area 3—Hall High .. | 10 | 230 | 3 | 233 |
| | 11 | 236 | 3 | 239 |
| | 12 | 211 | 6 | 217 |
| Totals...... | | 677 | 12 | 689 [3] |

At the time of registration, all white students living in the Mann attendance area elected to register at Central and the majority of Negro students residing in the Central and Hall attendance areas elected to register at Mann, as they were authorized to do under the registration announcement. However, 50 Negro students residing in the Central attendance area registered at that school (12 for 12th grade, 16 for 11th grade, and 22 for 10th grade); 3 Negro students residing in the Central area registered for attendance at Technical High (1 for grade 12, 2 for grade 10); 6 Negro students registered for attendance at Hall

3. Actual enrollment and attendance during the 1959–60 school year, as opposed to the above residential figures was estimated to be approximately 700 at Mann (all Negroes); 700 at Hall (3 Negroes); and 1600 at Central (6 Negroes).

High (2 for grade 12, 1 for grade 11, and 3 for grade 10). Of these latter, 5 resided in the Hall attendance area and 1 resided in the Central area. Thus, it appears that a total of 59 Negro students did not elect to exercise their option of registering at Mann High School.

We now come to the events of July 29 when initial assignments were made by the Board. Apparently, as the first business at hand, the Board adopted and issued certain Regulations describing criteria to be applied in making initial assignments and re-assignments and procedures therefor. These are set out in full in the trial court's opinion, Aaron v. Tucker, D.C., 186 F.Supp. at pages 915–918. The next business was making the assignments. Through testimony of members of the Board, it appears that only on registration forms submitted by Negro students who did not register at Mann, the notation "C/PP" (abbreviation of "Colored, Pupil Placement") was entered at some time by persons in charge of the registration. The Board denied that this was requested or authorized. Initial assignments were made, apparently from long lists previously prepared by the Superintendent's office. Three of the five Negro students who previously had been admitted to Central High during the 1957–58 year were initially assigned to Central, three Negroes were assigned to Hall, all remaining Negro students were assigned to Mann, despite their areas of registration, and the white students were assigned, apparently without exception, according to the school at which they had registered. In all, approximately 2600 students were assigned "en masse" at this July 29th meeting.

At the trial, members of the Board defended their action with the plea of the pressure of time and other duties; that they had "insufficient information" as to the Negro Students who had registered at Central, Hall and Technical, and that they felt that the rights of students could be adequately protected upon re-assignment hearings. It is established without any serious dispute that the Board's assignment criteria under the pupil placement laws was not applied to any white student in making these initial assignments; that no white student was refused assignment to the school of his residence area or registration; and although controverted, the evidence convincingly establishes that in making the initial assignments of plaintiffs and other Negro students, the Board's action was motivated and governed by racial considerations.

█ The procedures heretofore outlined in making initial assignments were clearly in violation of the constitutional rights of plaintiffs, and we so rule.

### Re-Assignment Hearings.

█ As ruled in Parham v. Dove, 271 F.2d at page 139, supra, and as observed by the trial court, it is necessary that students wishing to attack the action of the school board in the federal courts must first, as a condition precedent, exhaust the administrative procedures provided by the pupil assignment laws.[4] In accordance with the Board's published Regulations, numerous white and Negro students filed applications for re-assignment. Some applications were subsequently withdrawn and not all were carried to completion. However, a total of 49 applications were prosecuted in their entirety, 32 of these by white students, 17 by Negroes. Of the 32 applications of white students, 24 were granted re-assignment, 8 were denied; of the 17 Negro applications, 3 were approved, 14 were denied. Ten of the 14 plaintiff-intervenors completed the administrative process and are deemed to have exhaust-

---

4. The Arkansas statute, § 80–1531, also provides for review *de novo* in the state courts. However, as observed by the trial court, this avenue of relief is not a condition precedent to procedure in the federal courts, inasmuch as this is in the nature of judicial relief, not administrative remedy. See Dove v. Parham, 282 F.2d at page 262, supra.

ed their administrative remedies for the purposes of this appeal.[5]

While none of the intervenors individually directly attacks the Board's decision denying re-assignment, and although we have ruled that the procedures in making the initial assignments, in and of themselves, were discriminatory and a violation of plaintiffs' constitutional rights, nevertheless, we discuss in some detail the Board's action in processing these applications for re-assignment.

This Court fully appreciates the difficulties which faced the Board, but again, the facts speak for themselves, and objectively, this Court cannot overlook them. First, and foremost, of course is the circumstance that all 32 applications by white students were for the purpose of seeking transfer to schools *outside* of their areas of registration. The applications of Negro students were for the purpose of seeking re-assignment to schools *within* their residential area, with the exception of one Central area student requesting assignment to Hall.

As observed, Mann, Central and Hall provide similar academic schooling, and it was emphasized by members of the Board that for all general purposes the schools offered equal opportunities. Apparently, Central offers a few courses not provided by Hall, especially one in "Distributive Education" which affords opportunities for students to work in "on the job training" while attending high school. Mann does not provide some courses which are available to students at Central, namely, Speech, and certain language and business classes. It was pointed out at the hearings that such courses would be provided at Mann if there was sufficient demand for them.

There is a gradual rise in *median* I.Q. and achievement scores from Mann, Tech, Central and Hall, in that order. It was conceded in testimony, however, that in all schools there would naturally be students who fell below and rose above these median figures, and that there are bright, average and dull students in all of the schools.

Prior to evaluation of the applications for re-assignments by the Board, and at the request of the Board, home investigations were made by social workers, and psychological and intelligence tests were administered to those seeking re-assignment. Due to the press of time, it was testified that it was possible to conduct only 20 such investigations; however all 17 of the Negro applicants were subjected to these tests. Of the 24 applications of white students which were approved, 3 were "special education" students; 5 had health problems which would be aggravated by climbing stairs at Central; 5 were transferred from Hall to Central for special courses not available at Hall; 2 re-assignments were made because of administrative error in the initial assignments, and 9 applications were granted because of transportation arrangements and a wish to be with friends. In the 8 applications of white students which were denied, the Board felt that arrangements for transportation, the sole ground of the applications, were not sufficient to justify transfer of the student from the school of his initial assignment.

Review of the 3 Negro applications for re-assignment which were granted, reveals that one child was of very superior intelligence and an "A" student; that the others were of average intelligence, one

5. Apparently, one of the intervenors who completed the process of administrative review has not joined in this appeal. Two of the original plaintiffs in this action, Thelma Mothershed and Melba Patillo, who had attended Central during the 1957–58 school year, and who had registered there for the 1959–60 term, did not seek administrative relief through re-assignment hearings after they were initially assigned to Mann. At the trial, it appeared that both students were attending schools outside the State of Arkansas.

Various members of the Board testified that the initial assignments of these girls to Mann was based on the fact that one had failed to make a "proper adjustment" at Central, while the other, due to a heart condition, would be detrimentally affected by the stairs at that school.

an average student, the other an excellent student.[6]  As to the intervenor plaintiffs before us, whose applications were denied, it appears from exhibits that none is below the normal range of average intelligence, that some are poor students, some average students, and some excellent students; that several of these students had attended a "protest meeting" where it was announced that students refused to attend Mann High School, and some students in fact had enrolled late in the Mann school after it was pointed out that they were in violation of Board regulations.[7]

We have carefully studied the Board's minutes setting out the oral hearings conducted on each application.  The Board urges that there was no intimidation or unfair dealing as to any student, and that each was allowed a public or private hearing, as desired.  We observe that members of the Board and other school officials were aligned around a table and that each student appeared before this group to answer questions put to him.  We do not mean to quibble with the Board as to the action taken on any particular student; however, even a cursory examination of the transcripts of the hearings illustrates that white students were given a perfunctory examination, in contrast to extensive cross-examination of the Negro students.  One Negro student, whose application was finally granted, appeared before the Board on two different occasions.  Several were questioned extensively as to the adults present and sponsoring the "protest meeting" attended by some of the applicants. From a review of the Board's findings, several of the plaintiffs apparently impressed the Board as being "evasive," "disrespectful," "hostile," "un-cooperative," or as having "improper attitudes." In ruling on one case, and denying re-assignment, the Board observed: "While an attitude of 'sticking up for one's rights' is normally to be commended, this attitude could create an unbearable problem from the standpoint of the Board's efficient and effective operation of the schools in an extremely difficult transition period."[8]

■ To continue an analysis of the proceedings with respect to the applications of other Negro students for transfer or re-assignment would serve only to unduly burden this opinion.  The record in each case has received our careful consideration and, viewed collectively, we are convinced that Negro students were subjected to different treatment in the re-assignment procedures, that the Board was preoccupied with considerations not ordinarily deemed relevant to normal school criteria, and that, consciously or otherwise, the standards and criteria were applied by defendants for the purpose of impeding, thwarting and frustrating integration.  The record impels the finding that the relatively few Negro students who sought re-assignment were compelled to undergo a series

6. In connection with these two students, in discussing grounds for approval of re-assignment to Central, the Board observed, as to one:
"* * * facial features were more caucasian than negroid, and * * * manner of speech was crisp and distinct * * * conducted [self] with dignity but without any offensive pompousness * * *"
and as to the other:
"* * * physical features are much more Caucasian than Negroid, as is * * manner of speech * * * was courteous and alert at each hearing and maintained a respectful and proper attitude at all times."

7. Several students indicated that they believed that their opportunity to attend Central would be jeopardized if they enrolled in Mann.  Two of the Negroes whose applications were granted had attended this same meeting, but in their case, the Board decided to overlook this violation.

8. This student was found to possess the necessary academic background for continuing his studies at either Mann or at Central and the Board found that there was nothing from the standpoint of morals, health, or personal standards bearing on the application one way or the other.  This student failed, however, on "attitude and ability to adjust and home environment."  At the hearing of his child's application, the father of this student, a doctor, gave a rather spirited lecture to the Board as to its constitutional duties.

of tests covering various fields, such as education, psychology, sociology, religion and ethics, law or law enforcement, etc. See Mannings v. Board of Public Instruction, 277 F.2d at pages 374–375, supra. We again caution the defendants in the language employed by this Court in Dove v. Parham, 282 F.2d at page 258, supra:

"Standards of placement cannot be devised or given application to preserve an existing system of imposed segregation. Nor can educational principles and theories serve to justify such a result. These elements, like everything else, are subordinate to and may not prevent the vindication of constitutional rights. *An individual cannot be deprived of the enjoyment of a constitutional right, because some governmental organ may believe that it is better for him and for others that he not have this particular enjoyment. The judgment as to that and the effects upon himself therefrom are matters for his own responsibility.*" (Emphasis supplied.)

We also appropriately observe that under the plan it was contemplated that integration was to be effectively completed not later than 1963. On the record before us it is difficult to make determination of the present status of the situation. At the trial of this case, in March, 1960, counsel for defendants announced that the Board had resolved that it would not proceed with phase 2 during the 1960–61 term. In view of the stalemate which existed during the period of operation of the schools under adverse circumstances, 1957–58, and the fact that the schools were completely closed during 1958–59, the previous failure to move forward may perhaps be justified. However, as we approach the 1961–62 school year, sufficient time has elapsed to compel affirmative action in this regard, to the end that there may be integration in more than a token fashion.

To summarize, and to reiterate the responsibilities of defendants:

■ (1) The defendants, and their successors, are under an injunction which prevents them from engaging in any acts which are capable of serving to impede, thwart, or frustrate the execution of the integration plan which, as found herein, may be supplemented by a proper application of the Pupil Assignment Act of Arkansas. This injunction further requires that they "take *affirmative* steps, on their own initiative" to facilitate and accomplish operation of the school district on a non-discriminatory basis. (Emphasis supplied.) Aaron v. Cooper, 261 F.2d at page 108, supra; Aaron v. Cooper, 169 F.Supp. at page 337, supra.

■ (2) The standards and criteria of the pupil assignment law cannot be given application to preserve imposed segregation. The obligation to disestablish imposed segregation is not met by applying placement or assignment standards, educational theories or other criteria so as to produce the result of leaving the previous racial situation existing as it was before. If application of standards and criteria has the effect of preserving a created status of constitutional violation, such application fails to constitute a sufficient remedy in dealing with the constitutional wrong. Dove v. Parham, 282 F.2d at page 259, supra.

■ (3) The standards and criteria of the pupil assignment law must be applied objectively in the making of *initial* assignments of *all* students in the Little Rock school system to the end that imposed segregation is discontinued in the Little Rock schools as contemplated by the plan of integration.

(4) The standards and criteria of the pupil assignment law must be applied objectively in processing applications for transfers or re-assignments, and without discrimination based on race or color to the end that imposed segregation is discontinued in the Little Rock schools as contemplated by the plan of integration.

The judgment is reversed and the cause is remanded, and the district court is directed to retain jurisdiction of the cause to the end that our views as herein expressed are carried into effect.