305 F.2d 94
 Gwendolyn Yvette MARSH, an infant, and Raymond M. Iseley and Helen Iseley, her grandfather and grandmother and next friends; et al., Appellants,
v.
The COUNTY SCHOOL BOARD OF ROANOKE COUNTY, VIRGINIA, a body corporate; Herman L. Horn, Division Superintendent, Roanoke County Public Schools, et al., Appellees.
 No. 8535.
 United States Court of Appeals Fourth Circuit.
 Argued March 26, 1962.
 Decided June 12, 1962.
 
 James M. Nabrit, III, New York City (Jack Greenberg, New York City, and Reuben E. Lawson, Roanoke, Va., on the brief), for appellants.
 A. B. Scott, Richmond, Va. (Peyton, Beverley, Scott & Randolph, Richmond, Va., on the brief), for Pupil Placement Board, appellee.
 Benjamin E. Chapman, Salem, Va., for Roanoke County School Board and Division Superintendent, appellees.
 Before SOBELOFF, Chief Judge, and BOREMAN and J. SPENCER BELL, Circuit Judges.
 SOBELOFF, Chief Judge.
 
 
 1
 Seven Negro public school pupils living in Roanoke County brought this action in the United States District Court for the Western District of Virginia. They sought a declaratory judgment that the Virginia Pupil Placement Act[1] is being administered by the defendants so as to deprive the plaintiffs of their constitutional rights to nonsegregated education, and that the administrative procedures are inadequate to secure these constitutional rights. They also prayed for an injunction against the defendants to prevent race or color from being considered in their admission, enrollment, or education in the public schools or, in the alternative, for the submission of a plan which will be a "prompt and reasonable start toward desegregation of the public schools." The District Court denied relief, and five of the plaintiffs prosecute this appeal.
 
 
 2
 In Roanoke County, public school pupils are routinely assigned to totally segregated schools. There are in the county somewhat less than 1000 school age Negroes out of a total of 14,000 pupils, and not one of them attends public school with white children. The county school officials use a dual zoning system to insure the separation of the races. To determine which elementary schools Negro children shall attend, the county is divided into three geographic districts, while one high school serves the entire Negro population of the county. For the purpose of determining the assignments of white pupils to the twenty-five all-white elementary schools and high schools, the county is separately zoned. The dual zoning system is consistently employed by the local school officials, and their recommended assignments are regularly adopted by the state Pupil Placement Board. This bi-racial system is maintained in flagrant disregard of the Supreme Court's decisions in Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and of this court's unmistakable declaration that "[o]bviously the maintenance of a dual system of attendance areas based on race offends the constitutional rights of the plaintiffs and others similarly situated and cannot be tolerated." Jones v. School Board of City of Alexandria, Virginia, 278 F.2d 72, 76 (4th Cir. 1960).[2]
 
 
 3
 A Negro pupil who wishes to free himself from the segregated school to which he has been routinely assigned under the dual racial zoning system must apply for a transfer. Regardless of the applicant's place of residence, the county school officials habitually refer his application to the state board with the recommendation that he be assigned to the Negro school. By the established practice of the state board, a Negro, in order to be admitted to a white school, must not only live closer to that school than to the Negro school, but he must, in addition, meet a requirement that is not imposed upon white students seeking transfers, namely, in aptitude and scholastic achievement he is required to be substantially above the median of the class in the white school. Aptitude and achievement tests are not used in making the initial assignments to schools, for on admission, members of the two races are automatically segregated by separate but overlapping bi-racial school zones. The obvious function of these transfer criteria, which find application in respect to Negro children only, is to place next-to-impossible hurdles in their way so as to perpetuate segregation. Heretofore, we have several times condemned the use of criteria, otherwise lawful, in such a racially discriminatory manner. Thus, in Hill v. School Board of City of Norfolk, Virginia, 282 F.2d 473, 475 (4th Cir. 1960), we stated:
 
 
 4
 "* * * [where] assignments to the first grade in the primary schools are still on a racial basis, and a pupil thus assigned to the first grade still is being required to remain in the school to which he is assigned, unless, on an individual application, he is reassigned on the basis of the criteria which are not then applied to other pupils who do not seek transfers * * *, such an arrangement does not meet the requirements of the law."[3]
 
 
 5
 There is no doubt as to the unconstitutionality of the school assignment system as administered by the Roanoke County school officials and by the state Pupil Placement Board. Except for minor details, the system is identical to that which we recently condemned in Green v. School Board of City of Roanoke, Virginia, 304 F.2d 118 (4th Cir. 1962). And as in that case the plaintiffs and those similarly situated in Roanoke County are entitled to injunctive relief from a continuance of this unlawful discrimination.[4]
 
 
 6
 The District Court, however, denied relief on the ground that the plaintiffs had not exhausted available administrative remedies. The applications of the seven plaintiffs were filed on July 16, 1960, with the superintendent of the Roanoke County school system. They indicated their desire for admission to the all-white elementary Clearbrook School. Six of the plaintiffs previously attended the all-Negro Carver School; the seventh was seeking admission to the first grade. The Carver School is nine or ten miles from their homes, while the Clearbrook School is approximately two and one-half miles away. White elementary school children who live near the plaintiffs attend the Clearbrook School as do those who live farther away than the plaintiffs and in neighborhoods through which the plaintiffs pass on their way to the Carver School.
 
 
 7
 The school superintendent did not present the applications to the Roanoke County school board until August 4. The board in turn forwarded the applications for processing by the state Pupil Placement Board in Richmond as required by the Pupil Placement Act, with the superintendent's recommendation that each pupil should attend the Carver School. The covering letter made clear that the applications were from Negro pupils.
 
 
 8
 While no reasons for the adverse recommendations were communicated to the state board, the superintendent testified that "we had space for these children at Carver School and we did not have space for them at Clearbrook School." It is true that the pupil-teacher ratio was slightly higher at Clearbrook School than at Carver School, although the pupil-classroom ratio was approximately the same at both. However, in September, 1960, only shortly after the superintendent recommended rejection of the applications of the seven plaintiffs, twelve white pupils were newly admitted to Clearbrook School while in the same period forty-seven new Negro pupils were sent to Carver School. Overcrowding was not a bar to the admission of the white children to Clearbrook School while it was to the seven plaintiffs. Emphatically, the Constitution does not permit such criteria to be applied to one race and not to the other.[5]
 
 
 9
 Moreover, the fact that the children newly admitted to school in September were neatly divided into two groups according to race indicates that the superintendent's testimony about overcrowding as the reason for recommending that the seven plaintiffs not be admitted to the white school was a mere pretext to hide the real reason — the fact that the seven applicants were Negro. This conclusion is confirmed by the further testimony of the superintendent. Referring to the numerous other Negro school children living near the Clearbrook School but attending Carver School, he stated that "if I say yes to those seven, then I have no basis whatsoever of saying no to 100 more if they want to come — to be consistent." However, the fact that 100 additional pupils at Clearbrook School might place a severe strain on that school's facilities does not justify denial of the first seven pupils; the fear that applications which have not yet materialized might create a serious crowding problem is no reason for rejecting applicants before the problem has arisen.
 
 
 10
 Upon receiving the applications together with the county superintendent's recommendations and covering letter, the executive secretary of the state board on August 16 wrote the superintendent that the applications were filed less than sixty days before the beginning of the school year and so, by a regulation of the state board, were too late for action to be taken on them that year. This regulation had been adopted by the state board in July, 1959, the preceding year, and announced in memoranda circulated to the superintendents of the state's school systems. It was testified that copies were furnished to the wire services and to Richmond newspapers, but there was no evidence that the announcement of the rule ever appeared in the Roanoke newspapers. The Roanoke County school superintendent admitted that he made no attempt to inform those who might be interested in the rule: the memorandum was simply placed in his files. There was no announcement by the local school officials, and not even the application forms, where one would normally expect to find a notation of such a rule, gave any indication of it. Neither the plaintiffs nor their attorney knew about it.
 
 
 11
 On August 29, the state board formally met and denied the applications for noncompliance with this sixty-day rule. The parents were notified on August 30 of the state board's decision, and the next day this action was begun. The parents did not attempt to follow the formal protest procedure established by sections 22-232.8 — 232.14, as this could not have been completed before the beginning of the school year on September 6. In Green v. School Board of Roanoke City, Virginia, supra at 123, we upheld the District Court's ruling that in such circumstances there is no need to request a formal hearing before the state board.
 
 
 12
 We think that the District Court erred in denying relief in this case on the ground that the plaintiffs had not complied with the sixty-day rule. We are not to be understood as holding that in the administration of a non-discriminatory school assignment system a regulation requiring applications for transfer to be filed at least sixty days before the opening of the school year would be per se unreasonable. We hold only that in the context of this case, where the discrimination relates back to the initial assignments, the sixty-day rule may not be used as a pretext to defeat the vindication of constitutional rights.
 
 
 13
 The requirement that a plaintiff shall exhaust his administrative remedies before applying for judicial relief presupposes that the remedy to which he is referred is an effective one. As we said in McCoy v. Greensboro City Board of Education, 283 F.2d 667, 670 (4th Cir. 1960), "It is well settled that administrative remedies need not be sought if they are inherently inadequate or are applied in such a manner as in effect to deny the petitioners their rights." This is an apt description of the administrative remedies in the present case. The administrative procedure is an integral part of the assignment system that is vulnerable on constitutional grounds. Because the initial school assignments are made on a racial basis, full compliance by the plaintiffs with the transfer procedures cannot repair the discriminations to which they have been and are subjected. In view of the initial assignment system, the administrative procedures for transfer are, for the most part, applied to Negroes seeking a desegregated education and not to whites similarly situated.[6] To insist, as a prerequisite to granting relief against discriminatory practices, that the plaintiffs first pass through the very procedures that are discriminatory would be to require an exercise in futility. This case is like Farley v. Turner, 281 F.2d 131 (4th Cir. 1960), where we agreed with the District Court that the Negro pupils were not under obligation to pursue administrative remedies when it was shown that under the unvarying practice their applications would be processed in an unconstitutional manner and would inevitably be denied.
 
 
 14
 The defendants may not rely on Carson v. Warlick, 238 F.2d 724 (4th Cir. 1956). That case held only that the recently enacted North Carolina Pupil Enrollment Act,[7] which is similar in general outline to the Virginia statute involved here, was not unconstitutional on its face. At that time there was no claim and no way of knowing that the statute would be utilized so as to perpetuate segregated schools.[8] Our opinion noted that the question as to whether the statute had been unconstitutionally applied was not before us, and so we did not have to decide whether administrative remedies need be exhausted if they were shown to be a part of the discriminatory administration of the Act. However, this very issue soon came before the court. In School Board of City of Charlottesville, Virginia v. Allen, 240 F.2d 59, 63-64 (4th Cir. 1956), Chief Judge Parker made the following observations:
 
 
 15
 "Defendants argue, in this connection, that plaintiffs have not shown themselves entitled to injunctive relief because they have not individually applied for admission to any particular school and been denied admission. The answer is that in view of the announced policy of the respective school boards any such application to a school other than a segregated school maintained for Colored people would have been futile; and equity does not require the doing of a vain thing as a condition of relief. Reliance is placed upon our decision in Carson v. Warlick, 4 Cir., 238 F.2d 724. In that case, however, an adequate administrative remedy had been prescribed by statute, the plaintiffs there had failed to pursue the remedy as outlined in the decision of the Supreme Court of the State and there was nothing upon which a court could say that if they had followed such remedy their rights under the Constitution would have been denied them."[9]
 
 
 16
 In the present case, as we have seen, the plaintiffs have made the required showing that the statute as administered by the state and county officials provides no adequate means to redress the discriminatory treatment. And the testimony of the chairman of the state Pupil Placement Board sufficiently demonstrates that it will not change its policy in the future without judicial intervention. Seven years after Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), he testified that his board has no plans for desegregation, and no intention to forbid local boards from continuing the dual zoning system. In sharp contradiction to the teachings of the Supreme Court in the second Brown v. Board of Education case, 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and in Cooper v. Aaron, 358 U.S. 1, 7, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), delineating the affirmative duty resting upon the school authorities, he declared his understanding that "there was nothing in the decision, the Brown case, that said we [the state school officials] have to proceed to try to bring about the desegregation of the State of Virginia."
 
 
 17
 The record conclusively establishes that the plaintiffs are entitled to a declaratory judgment that the defendants are administering the Pupil Placement Act in an unconstitutional manner and to an injunction against the further use of racially discriminatory criteria in the assignment of pupils to schools. The injunction should be promptly issued so as to control the assignment of pupils for the coming 1962-63 school year. However, the defendants may submit to the District Court a plan for ending the existing discrimination. "Any such plan, before being approved by the District Court, should provide for immediate steps looking to the termination of the discriminatory practices `with all deliberate speed' in accordance with a specified time table." Green v. School Board of City of Roanoke, Virginia, supra at 124.
 
 
 18
 Reversed and remanded for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Va.Code Ann. §§ 22-232.1 — 232.17 (Supp 1960)
 
 
 [2]
 Northcross v. Board of Education of City of Memphis, 302 F.2d 818 (6th Cir.1962); Dodson v. School Board of City of Charlottesville, Virginia, 289 F.2d 439, 442-443 (4th Cir.1961); Norwood v. Tucker, 287 F.2d 798, 803-806 (8th Cir.1961); School Board of City of Charlottesville, Virginia v. Allen, 240 F.2d 59 (4th Cir.1956)
 
 
 [3]
 Northcross v. Board of Education of City of Memphis, 302 F.2d 818 (6th Cir.1962); Dodson v. School Board of City of Charlottesville, Virginia, 289 F.2d 439, 442-443 (4th Cir.1961); Norwood v. Tucker, 287 F.2d 798, 806-809 (8th Cir.1961); Jones v. School Board of City of Alexandria, Virginia, 278 F.2d 72, 77 (4th Cir. 1960); Mannings v. Board of Public Instruction, 277 F.2d 370, 374-375 (5th Cir. 1960); Hamm v. County School Board of Arlington County, Virginia, 264 F.2d 945 (4th Cir.1959); School Board of City of Charlottesville, Virginia v. Allen, 240 F. 2d 59 (1956)
 
 
 [4]
 Northcross v. Board of Education of City of Memphis, 302 F.2d 818 (6th Cir.1962); Mannings v. Board of Public Instruction, 277 F.2d 370, 372-375 (5th Cir.1960); School Board of City of Charlottesville, Virginia v. Allen, 240 F.2d 59 (1956); Frasier v. Board of Trustees of University of North Carolina, 134 F.Supp. 589, 593 (M.D.N.C.1955) (three-judge court), aff'd, 350 U.S. 979, 76 S.Ct. 467, 100 L. Ed. 848 (1956)
 
 
 [5]
 Hill v. School Board of City of Norfolk, Virginia, 282 F.2d 473 (4th Cir.1960)
 
 
 [6]
 Jones v. School Board of City of Alexandria, Virginia, 278 F.2d 72, 77 (4th Cir. 1960)
 
 
 [7]
 N.C.Gen.Stat. §§ 115-176 — 115-179 (1960)
 
 
 [8]
 Nor had such showing been made in the following cases: Hood v. Board of Trustees of Sumter County School District, 286 F.2d 236 (4th Cir.1961); Holt v. Raleigh City Board of Education, 265 F.2d 95 (4th Cir.1959); Covington v. Edwards, 264 F.2d 780 (4th Cir. 1959); Carson v. Board of Education of McDowell County, 227 F.2d 789 (4th Cir.1955)
 
 
 [9]
 See Northcross v. Board of Education of City of Memphis, 302 F.2d 818 (6th Cir. 1962); Mannings v. Board of Public Instruction, 277 F.2d 370, 372-375 (5th Cir. 1960); Gibson v. Board of Public Instruction, 272 F.2d 763, 766-767 (5th Cir. 1959)