Ray JOHNSON, Appellant,

v.

SEABOARD AIR LINE RAILROAD COMPANY, Appellee.

Charles W. WALKER, Appellant,

v.

PILOT FREIGHT CARRIERS, INC., Appellee.

Nos. 12154, 12155.

United States Court of Appeals Fourth Circuit.

Argued May 9, 1968.

Decided Oct. 29, 1968.

Certiorari Denied March 24, 1969. See 89 S.Ct. 1189.

4. O'Brien v. United States, 284 F.2d 692 (Ct.Cl.1960).

Robert Belton, New York City (Jack Greenberg, James M. Nabrit, III, Gabrielle A. Kirk, New York City, J. LeVonne Chambers, Charlotte, N. C., Conrad O. Pearson, Durham, N. C., Joseph W. Bishop, Jr., New Haven, Conn., Albert Rosenthal, New York City, and Sanford Jay Rosen, Baltimore, Md., on brief) for appellants.

Thomas Ashe Lockhart and W. Thomas Ray, Charlotte, N. C. (John S. Cansler, Cansler & Lockhart, Charlotte, N. C., and John W. Weldon, Jacksonville, Fla., on brief) for appellee Seaboard Air Line Railroad Co.

Brown Hill Boswell, Charlotte, N. C. (J. W. Alexander, Jr., and Blakeney, Alexander & Machen, Charlotte, N. C., on brief) for appellee Pilot Freight Carriers, Inc.

Russell Spector, Senior Atty., Equal Employment Opportunity Commission (Kenneth F. Holbert, Acting Gen. Counsel, David R. Cashdan, Atty., Equal Employment Opportunity Commission, John Doar, Asst. Atty. Gen., David L. Norman, Elihu E. Leifer, Attys., Dept. of Justice, and Macon L. Weaver, U. S. Atty., on brief) for Equal Employment Opportunity Commission as amicus curiae.

Before BOREMAN, WINTER and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Whether an actual attempt by the Equal Employment Opportunity Commission to eliminate an unlawful employment practice is a jurisdictional prerequisite to a suit by an individual plaintiff [1] under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(e) is the question presented by these appeals. We think not and reverse the orders of the district judge granting the defendants' motions to dismiss.

Ray Johnson, on January 14, 1966, filed a charge of employment discrimination with the Commission against Seaboard Coast Line Railroad Company. The Commission's investigation of the charge showed that Johnson, who had been employed by Seaboard as a porter from 1940 to 1965, was dismissed, ostensibly because of a conviction for a misdemeanor; that the offense occurred while Johnson was off duty and not on Seaboard's property and occasioned no loss of time from his job; that Johnson had written letters protesting Seaboard's racial discrimination to the President's Committee on Equal Employment, the National Railroad Adjustment Board, and the United States Attorney General; and that Seaboard's agents were uncooperative when questioned by the Commission's investigator about company practices and regulations used to discipline white employees and about conduct standards used for Seaboard's employees generally.[2] On the basis of these findings, the Commission determined, on July 18, 1966, that there was reasonable cause to believe that Seaboard had violated Title VII in dismissing Johnson. On August 8, 1966, the Commission notified Johnson by letter that due to its heavy work load it had been "impossible to undertake or to conclude conciliation efforts," but that he was entitled to institute a civil action within 30 days of receipt of the letter.[3] Johnson filed his

1. The district court did not consider the question of whether and to what extent an individual might prosecute a class action. We thus express no opinion on the question. Compare Hall v. Werthan Bag Corp., 251 F.Supp. 184, 187–188 (M.D.Tenn.1966), with Mondy v. Crown Zellerbach Corp., 271 F.Supp. 258, 264–266 (E.D.La.1967).

2. The superintendent of Seaboard's Georgia Division indicated that disciplinary records were not available for inspection by the Commission's investigator. 42 U.S.C. § 2000e–8(a) provides that "the Commission * * * shall * * * have access to * * * any evidence of any person being investigated * * * that relates to unlawful employment practices * * * and is relevant to the charge under investigation."

3. The text of the Commission's letter to Johnson is as follows.

"Due to the heavy workload of the Commission, it has been impossible to undertake or to conclude conciliation efforts in the above matter as of this date. However, the conciliation activities of the Commission will be undertaken and continued.

"Under the provisions of Section 706 (e) of Title VII of the Civil Rights Act of 1964, the Commission must notify you of your right to bring an action in Federal District Court within a limited time after the filing of a complaint.

"This is to advise you that you may within thirty days of the receipt of this letter, institute a civil action in the appropriate Federal District Court. If you are unable to retain an attorney, the Federal Court is authorized

complaint in the District Court for the Western District of North Carolina on September 7, 1966.

The facts in No. 12,155 are substantially similar. Charles Walker filed his charge with the Commission on February 28, 1966, and amended it on March 15, 1966. On July 20, 1966, the Commission determined that reasonable cause existed in Walker's case also, basing the decision on its investigation which showed that Walker's application to Pilot Freight Carriers, Inc. for employment as an over-the-road truck driver was denied; that no Negroes were currently employed by Pilot and had been employed in the past only in casual positions; that Pilot hired five drivers after Walker's application was denied; that of the five, two had applied after Walker, and only one of the five met the company's employment qualifications; and that Pilot made no effort to determine Walker's qualifications. A letter, similar in all respects to the one sent Johnson, was mailed to Walker by the Commission on August 5, 1966, and on August 23, 1966, Walker filed his complaint.

On the basis of a memorandum of decision filed January 25, 1968, the District Court for the Western District of North Carolina dismissed the complaints of both Johnson and Walker on the sole ground that "Congress intended that conciliation efforts be made prior to the institution of civil actions and that this is a jurisdictional prerequisite to the right to file a civil action."

■ It seems clear to us that the statute, on its face, does not establish an attempt by the Commission to achieve voluntary compliance as a jurisdictional prerequisite. Quite obviously, 42 U.S.C. § 2000e-5(a) does charge the Commission with the duty to make such an attempt if it finds reasonable cause, "but it does not prohibit a charging party from filing suit when such an attempt fails to materialize."[4] Mondy v. Crown Zellerbach Corp., 271 F.Supp. 258, 262 (E.D.La. 1967). Subsection (e), which contains the authorization for civil actions, provides only that the action may not be brought unless "the Commission [had] been unable to obtain voluntary compliance."[5]

in its discretion, to appoint an attorney to represent you and to authorize the commencement of the suit without payment of fees, costs or security. If you decide to institute suit and find you need such assistance, you may take this letter, along with the enclosed Commission determination of reasonable cause to believe Title VII has been violated, to the Clerk of the Federal District Court nearest to the place where the alleged discrimination occurred, and to request that a Federal District Judge appoint counsel to represent you.

"Please feel free to contact the Commission if you have any questions about this matter."

4. 42 U.S.C. § 2000e-5(a):
"Whenever it is charged in writing under oath by a person claiming to be aggrieved, or a written charge has been filed by a member of the Commission where he has reasonable cause to believe a violation of this subchapter has occurred * * * that an employer, employment agency, or labor organization has engaged in an unlawful employment practice, the Commission shall furnish such employer, employment agency,

or labor organization * * * with a copy of such charge and shall make an investigation of such charge, provided that such charge shall not be made public by the Commission. If the Commission shall determine, after such investigation, that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion."

5. 42 U.S.C. § 2000e-5(e):
"If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) of this section (except that in either case such period may be extended to not more than sixty days upon a determination by the Commission that further efforts to secure voluntary compliance are warranted), the Commission has been unable to obtain voluntary compliance with this subchapter, the Commission shall so notify the person aggrieved and a civil action may, within thirty days thereafter, be brought against the respondent named in the charge (1) by

The defendants argue that Section 2000e–5 must be read as a whole and that, so read, the use of the word, "unable," in subsection (e) implies that the duty imposed by subsection (a) must be fully performed before a civil action is authorized. We do not agree. "Unable" is not defined by statute to give it a narrow or special meaning. We think "unable" means simply unable—and that a commission prevented by lack of appropriations and inadequate staff[6] from attempting persuasion is just as "unable" to obtain voluntary compliance as a commission frustrated by the recalcitrance of an employer or a union. Contra, Dent v. St. Louis-San Francisco Ry. Co., 265 F.Supp. 56, 61 (N.D.Ala.1967). At most, we think, a reading of the two sections together means only that the Commission must be given an *opportunity* to persuade before an aggrieved person may resort to court action. See Stebbins v. Nationwide Mut. Ins. Co., 382 F.2d 267 (4th Cir. 1967); Mickel v. South Carolina State Employment Serv., 377 F.2d 239 (4th Cir. 1967).

If the plain language of the statute will not support their contention, the defendants, relying heavily on Dent v. St. Louis-San Francisco Ry. Co., supra, urge that its legislative history shows a congressional intent to require that civil actions under Title VII be preceded by informal efforts to achieve voluntary compliance. However, the legislative history is not so clear as the defendants would have it. Hall v. Werthan Bag Corp., 251 F.Supp. 184, 186 (M.D.Tenn. 1966). The bill underwent extensive revisions culminating in a leadership compromise,[7] and "a cogent explanation of the policies underlying the compromise was never offered." Comment, 32 U.Chi. L.Rev. 430, 432 (1965).

Our examination of the bill's history indicates that either side can find statements that, taken out of context, support their position.[8] For example, during the debate that we regard as most enlightening on the issue at hand, totally inconsistent explanations of the bill were offered by its proponents and its opponents. Senator Ervin remarked,

"It may not mean anything to the Senator from New Jersey [Mr. Case] but the bill certainly puts the key to the courthouse door in the hands of the Commission. This is true because the aggrieved party cannot sue in the Federal courts unless the Commission first finds that there is reasonable cause to believe the charge is true and then fails to adjust the matter by conciliation."

110 Cong.Rec. 14188 (1964). Apparently in reply to Senator Ervin, Senator Javits said,

"The fatal defect of the amendment is that the provision it would amend is not the key to the courtroom door, because the Commission does not have to find that the complaint is a valid one before the complainant individually can sue * * *. The only thing this title gives the Commission is time

---

the person claiming to be aggrieved, or (2) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice * * *."

6. During the first six months of the Commission's operation more than 1,500 charges said to merit investigation were culled from the several thousand that were filed. At that time the Commission had fewer than 20 full time investigators and only two full time conciliators. At the present time, 1,400 charges are awaiting investigation, and 375 cases are awaiting conciliation. See Rosen, Book Review, 81 Harv.L.Rev. 276 at 282 and 286 n. 33 (1967).

7. "As with any new statute, Title VII leaves many questions unanswered. They are especially abundant in the procedural area because of the last minute creation of a new enforcement system for Title VII as the basis for the so-called 'leadership compromise' necessary to obtain Republican votes for Senate cloture over debate on the entire Civil Rights Act." Walker, Title VII: Complaint and Enforcement Procedures and Relief and Remedies, 7 B.C.Ind. & Com. L.Rev. 495, 523–524 (1966).

8. The court in Mondy v. Crown Zellerbach Corp. reached the same conclusion. 271 F.Supp. 258, 262 (E.D.La. 1967).

in which to find that there has been a violation and time in which to seek conciliation. * * *

"But Mr. President, that is not a condition precedent to the action of taking a defendant into court. A complainant has an absolute right to go into court, and this provision does not affect that right at all."

Id. at 14191. And Senator Humphrey's opinion was, "The individual may proceed in his own right at any time. He may take his complaint to the Commission, he may bypass the Commission, or he may go directly to court." Id. at 14188.

Such diversity of opinion, without more, destroys defendants' contention that the legislative history compels their interpretation of the Act. Moreover, none of these statements was directed to the jurisdictional question. They were, instead, directed to Senator Ervin's amendment No. 590 which was designed to strike out that portion of Title VII that permits a member of the Commission to file a charge of discrimination against an employer.[9] Senator Ervin's argument was that this provision entrusted the Commission with the roles of both prosecutor and judge; the opponents of the amendment argued that since the Commission was enpowered only to determine probable cause, no due process problem would be occasioned by this dual role. It was in reply to that argument that Senator Ervin, in an effort to point out that the Commission's power was not so minimal as the bill's proponents suggested, made the statement quoted above. No one's attention was more than tangentially directed to the problem of jurisdictional prerequisites for a civil action.[10] If we were compelled to choose among the statements, we would be more inclined to accept the statements of Senators Humphrey and Javits, indulging the inference that those who voted with them to defeat the amendment must have understood the bill in the same manner as they.

The defendants also rely on an amendment[11] offered by Representative Celler designed to "make it clear that an attempt would have to be made to conciliate * * * before an action could be brought in the district court." 110 Cong.Rec. 2566 (1964) (remarks of Rep. Celler). However, at the time this amendment was adopted, the "enforcement provisions of Title VII were patterned after the provisions of the National Labor Relations Act: the Equal Employment Opportunity Commission was to have authority to issue cease-and-desist orders and to seek enforcement of those orders in the courts, and the emphasis was upon protection of the public interest and upon obtaining broad compliance with the provisions of the title." Hall v. Werthan Bag Corp., 251 F.Supp. 184, 186 (M.D.Tenn.1966). Subsequently, the Commission's powers of enforcement were deleted from the statute and the "emphasis shifted toward the vindication of individual rights and the burden of enforcement shifted from the Commission to the 'person aggrieved.'" Ibid. See also, Berg, Equal Employment Opportunity Under the Civil Rights Act of 1964, 31 Brooklyn L.Rev. 62, 85–86 (1964–1965). We think that the shift in emphasis deprives the Celler amendment of much of the weight which we would otherwise accord it. Contra, Dent v. St. Louis-San Francisco Ry. Co., supra, 265 F.Supp. at 59.

■ We have not ignored statements made in Congress after the shift had occurred. While we concede that these statements place heavy emphasis on the

---

9. This provision is now found in 42 U.S. C. § 2000e–5(a).

10. No issue more closely in point was debated after the compromise version of the bill was presented to the Senate, perhaps because debate was severely limited shortly thereafter when cloture was invoked.

11. The bill, as originally presented to the House of Representatives, expressly provided that a civil action could be brought in advance of conciliation efforts if warranted by the circumstances. Representative Celler's amendment deleted the language, "or in advance thereof if circumstances warrant."

desirability of voluntary compliance, we think that they fall far short of establishing congressional intent that actual conciliatory efforts by the Commission are a jurisdictional prerequisite to initiating court action.[12] Indeed, two of the remarks relied on were made during the course of the debate on Senator Ervin's amendment No. 590, referred to above.[13]

However unclear the statute and its history are with respect to the jurisdictional problem at hand, the policies and purposes of the Act are clearly discernable.[14] There can be no doubt that Congress intended to attack the problem of discriminatory employment practices by first seeking voluntary compliance by the nation's employers. But neither can there be any doubt that Congress intended the remedies provided to be timely and effective. Thus, subsections (b) and (c) of 42 U.S.C. § 2000e–5 allow the individual aggrieved or the Commission to proceed after state authorities have been given 60 days in which to act. And subsection (e) allows the Commission to give an aggrieved individual notice of his right to file a civil action when it has been unable within 30 days to achieve voluntary compliance.[15] Obviously, to the extent these

12. Ambiguous as the statements seem to us, we reprint them here out of fairness to the defendants:

"We have leaned over backwards in seeking to protect the possible defendants by means of all the procedures referred to—those of conciliation, arbitration, and negotiation." 110 Cong. Rec. 14190 (remarks of Senator Morse).

"If efforts to secure voluntary compliance fail, the person complaining of discrimination may seek relief in a federal district court." Id. at 12617 (remarks of Senator Muskie).

"An aggrieved party may initiate action under the provisions of the bill on a federal level. In such cases, provision is made for Federal conciliation in an effort to secure voluntary compliance with the law prior to court action." Id. at 12690 (remarks of Senator Saltonstall).

"The point of view of this section is to permit one who believes he has a valid complaint to have it studied by the Commission and settled through conciliation if possible. The Court procedure can follow.

"In Massachusetts, we have had experience with an arrangement of this sort for 17 years and as I recall, approximately 4,700 unfair practice complaints have been brought before our Massachusetts Commission Against Discrimination. Only two of them have been taken to court for adjudication. That procedure is the basis and theory of this part of the bill and that is why I support it." Id. at 14191 (remarks of Senator Saltonstall).

"Those of us who have worked upon the substitute package have sought to simplify the administration of the bill * * * in terms of seeking a solution by mediation of disputes, rather than forcing every case before the Commission or into a court of law.

\* \* \* \* \*

"We have placed emphasis on voluntary conciliation—not coercion.

\* \* \* \* \*

"The amendment of our substitute leaves the investigation and conciliation functions of the Commission substantially intact.

\* \* \* \* \*

"Section 706(e) provides for suit by persons aggrieved after conciliation has failed." Id. at 12722–23 (remarks of Senator Humphrey).

13. For a more thorough analysis of the statute's legislative history, see Vaas, Title VII: Legislative History, 7 B.C. Ind. & Com.L.Rev. 431 (1966).

14. The report of the House Committee on the Judiciary stated,

"The purpose of this title is to eliminate, through the utilization of formal and informal remedial procedures, discrimination in employment based on race, color, religion, or national origin * * *.

"Section 701(a) sets forth a congressional declaration that all persons within the jurisdiction of the United States have a right to the opportunity for employment without discrimination on account of race, color, religion, or national origin. It is also declared to be the national policy to protect the right of persons to be free from such discrimination."
H.R.Rep. No. 914, 88th Cong., 2d Sess. (1964), U.S.Code Cong. & Admin.News 1964, p. 2401. See also, 42 U.S.C. § 2000e(b).

15. Although we have pointed out the danger in relying too heavily on the rather chaotic legislative history of this bill,

policies conflict they must be reconciled in light of the statute's overriding purpose. To give ample scope to the policy in favor of voluntary compliance, we have held, and now affirm, that the Commission can not be bypassed entirely. Stebbins v. Nationwide Mut. Ins. Co., 382 F.2d 267 (4th Cir. 1967); Mickel v. South Carolina State Employment Serv., 377 F.2d 239, 241 (4th Cir. 1967). To give ample scope to the policy in favor of timely remedial action, we now hold that the individual aggrieved may file a suit in the district court when he has received the statutory notice from the Commission and that he need not await an actual attempt by the Commission to achieve voluntary compliance. Mondy v. Crown Zellerbach Corp., 271 F.Supp. 258 (E.D.La.1967); Moody v. Albermarle Paper Co., 271 F.Supp. 27 (E.D. N.C.1967); Quarles v. Philip Morris, Inc., 271 F.Supp. 842 (E.D.Va.1967); see Evenson v. Northwest Airlines, Inc., 268 F.Supp. 29 (E.D.Va.1967); Hall v. Werthan Bag Corp., 251 F.Supp. 184 (M.D.Tenn.1966). Contra, Dent v. St. Louis-San Francisco Ry. Co., 265 F.Supp. 56 (N.D.Ala.1967); see Choate v. Caterpillar Tractor Co., 274 F.Supp. 776 (S.D. Ill.1967).

In Quarles v. Philip Morris, Inc., 271 F.Supp. 842, 847 (E.D.Va.1967), Judge Butzner said:

"The plaintiff exhausted administrative remedies and satisfied the requirements of the Act by filing a complaint with the Commission and awaiting its advice. He is not required to show that the Commission has endeavored to conciliate. To insist that he do so, would require him to pursue an administrative remedy which may be impossible to achieve. If the Commission makes no endeavor to conciliate, the remedy is ineffective and inadequate.

"In this circuit the rule is clear. Judge Sobeloff wrote, in Marsh v. County School Bd. of Roanoke Co., Va., 305 F.2d 94, 98 (4th Cir. 1962):

'The requirement that a plaintiff shall exhaust his administrative remedies before applying for judicial relief presupposes that the remedy to which he is referred is an effective one. As we said in McCoy v. Greensboro City Board of Education, 283 F. 2d 667, 670 (4th Cir. 1960), "It is well settled that administrative remedies need not be sought if they are inherently inadequate or are applied in such a manner as in effect to deny the petitioners their rights.'"

■ The shift in the Congress from a rationale of national official enforcement to a policy of private individual vindication is, we think, of controlling importance.[16] While the emphasis of the bill was on protection of the public interest, a greater emphasis on voluntary compliance was reasonable. But with the

---

we think it worth mentioning in passing that the policy in favor of timely relief was present early in the bill's history. The Republican members of the House Committee on the Judiciary stated in their addendum to H.R.Rep. No. 914, 88th Cong., 2d Sess. (1964), "As the title was originally worded, the Commission would have had authority to not only conduct investigations, but also institute hearing procedures and issue orders of a cease-and-desist nature. A substantial number of committee members, however, preferred that the ultimate determination of discrimination rest with the Federal judiciary. Through this requirement, we believe that settlement of complaints will occur *more rapidly and with greater frequency*." (Emphasis added.)

16. "Probably the most significant change made in Title VII by the leadership compromise was to deprive the Equal Employment Opportunity Commission of the right to bring suits to enforce compliance with the title and to substitute an individual right of action by the person aggrieved. * * * This represented a rather basic change in the philosophy of the title and implied an appraisal of discrimination in employment as a private rather than a public wrong, a wrong, to be sure, which entitles the damaged party to judicial relief, but not one so injurious to the community as to justify the intervention of the public law enforcement authorities." Berg, Equal Employment Opportunity Under the Civil Rights Act of 1964, 31 Brooklyn L.Rev. 62, 67 (1964–65).

present emphasis on private vindication of individual rights, fairness to an aggrieved individual demands that timeliness assume a greater importance and excessive delays cannot be justified.[17]

There is no corresponding unfairness to employers or unions for the reason that there is no right to persist in invidious discrimination. All that defendants ask is not to be sued before being persuaded to comply with the law. They can, of course, do so without persuasion, or may be persuaded to do so without resort to the complaint procedure.[18]

Reversed.

BOREMAN, Circuit Judge (dissenting):

With due respect for the opinions of my brothers I find myself in disagreement with them in these cases. Accordingly, I record my views in this separate statement.

The statutes here principally involved (Title VII, § 706, 42 U.S.C. § 2000e–5, subsections (a) and (e), are set out in footnotes numbered 4 and 5 of the majority opinion. There is no need to reproduce them here. The majority view is that the "statute, on its face, does not establish an attempt by the Commission to achieve voluntary compliance as a jurisdictional prerequisite" to the bringing of a civil action by a person allegedly aggrieved.

In each of these cases the Commission admittedly made no effort whatsoever to eliminate the alleged unlawful employment practice by the informal methods prescribed by statute. The only reason assigned by the Commission for such failure was its "heavy work load." By this simple expedient the Commission sought to bypass the clear provisions of the statute, to render them meaningless and thereby open the floodgates to the judiciary when the obvious intent of the lawmakers, as indicated by the language of the statute and the legislative history, was to place the primary burden on the Commission, to protect employers and other persons subject to the provisions

17. Perhaps this is a partial answer to the argument made by the court in *Dent* and by the defendants in this court that since the Dirksen compromise involved a "softening" of the enforcement provisions, it is "contrary to logic to construe this measure as permitting the institution of a civil action without conciliation and thus as providing less protection to potential defendants and as placing less emphasis on voluntary compliance than did the House bill." Dent v. St. Louis-San Francisco Ry. Co., 265 F.Supp. 56, 59 (N.D.Ala.1967). The fallacy in the "contrary to logic" argument is that it ignores the greater need for individual access to the courts where private vindication is the substituted sanction and considers only the impact upon defendant employers and unions.

18. Indeed, Franklin D. Roosevelt, Jr., Chairman of the Commission, has pointed out that the complaint procedure is not to be relied upon as the most effective means of achieving the statutory purpose:

"To assist businesses throughout the country in establishing and carrying forward an affirmative action program on a community-wide basis, the Office of Technical Assistance, which is the educational and promotional arm of the Commission, has prepared a step-by-step plan, based on established and successful programs. In an effort to broaden business participation, Technical Assistance has scheduled a 'Sixty-City Plan,' calling for regional meetings with small groups of business leaders on the community level during the coming months. The purpose is to counsel and guide these leaders in forming Merit Employment Councils in their respective communities and to cooperate with them in establishing equal employment programs. Meetings are being held in key cities throughout the country and are expected to draw businessmen from surrounding communities. A traveling field staff will follow up on the meetings, contacting the participants for reports of progress and offering solutions to the problems which they may face.

"It is our hope that through persuasive and aggressive promotion of affirmative action we may be able to achieve more significant results, both quantitative and qualitative, for minority group workers than through the complaint procedure."
7 B.C.Ind. & Comm.L.Rev. 413–14 (1966).

of the statute from subjection to the burden of frivolous claims and demands, and to protect the courts from the anticipated deluge of civil actions to enforce the newly-created statutory civil rights.

It is elementary that the fundamental purpose of conciliation is to avoid litigation. In these cases appellants (hereafter plaintiffs) would have the court adopt the unnatural view that conciliation may *follow* litigation at the election of a litigant. Undeniably, if conciliation is to *follow* litigation then its whole purpose is defeated and the effort of Congress to require it prior to litigation is reduced to an idle gesture. This point is clearly manifested in the wording of the statute and it was recited again and again in the legislative history as will be later noted. Plaintiffs seek to persuade the court to read and construe subsection (e) standing alone and not in conjunction with subsection (a). That argument entirely overlooks subsection (a) as well as other pertinent language in subsection (e). The language of subsection (a) of section 706 is clear that if the Commission finds reasonable cause to believe the charge is true it *shall endeavor* to eliminate the practice by "informal methods." The language of subsection (e) of section 706 further establishes, as the court below stated, that *after* this effort is made by the Commission it *then* becomes its duty to report its failure to the aggrieved party who may *then* institute action in court. Subsection (e) gives the Commission power to extend conciliation beyond thirty days if *further efforts* to secure voluntary compliance are warranted. The words "further efforts" clearly connote that Congress contemplated that initial efforts to conciliate had already gone before. Furthermore, after an action has been commenced in the district court, subsection (e) authorizes the Commission to request the court to stay proceedings pending the *termination* of the efforts of the Commission "to obtain voluntary compliance." This language is further proof that conciliation efforts must have begun before suit is filed.

Applying elementary rules of statutory construction, section 706 must be read as a whole in order to ascertain its true meaning. Each part or section should be construed in connection with every other part or section to produce a harmonious whole.[19] Reading subsections (a) and (e) together, I reach the conclusion that conciliation efforts *must* precede suit. This conclusion was reached by Professor Sovern of the Columbia Law School and Legal Consultant to the NAACP Legal Defense and Education Fund. As he stated in a treatise on this subject:

"That the structure of § 706, with its linkage of the individual suit to Commission conciliation, leads naturally to the conclusion that the complainant cannot sue until the Commission takes the steps specified, could not have been lost on Congress * * *."[20]

In analyzing the language of the statute the court in Dent v. St. Louis-San Francisco Ry. Co., 265 F.Supp. 56, 62 (N.D.Ala.1967), stated:

" * * * It not only speaks of 'the termination' of conciliation but was likewise explained in Congress as authorizing a stay pending 'further efforts at conciliation by the Commission,' [110 Cong.Rec. 15866 (July 2, 1964)] and it therefore is to authorize a stay for the termination or continuation of conciliation efforts, not for their initiation."

In referring to subsection (e) and noting that the Commission has up to sixty days to attempt to secure voluntary compliance the following statement appears in the Harvard Law Review:

"Only after this effort has failed may the aggrieved person bring an ac-

---

19. 2 Sutherland, Statutory Construction, § 4703; Mastro Plastics Corp. v. National Labor Relations Board, 350 U.S. 270, 285, 76 S.Ct. 349, 100 L.Ed. 309 (1956); National Labor Relations Board v. Lion Oil Co., 352 U.S. 282, 288, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957).

20. Sovern, Legal Restraints on Racial Discrimination in Employment, 82 (1966).

tion for relief, and even then the court may, upon request, stay proceedings for up to 60 additional days pending \* \* \* the *further* efforts of the Commission to obtain compliance." (Emphasis added.) [21]

The passage of this civil rights legislation and the statutory provisions pertinent here were accomplished only after much debate, after amendments were proposed and material changes made which differed from the original proposals. "Seldom has similar legislation been debated with greater consciousness of the need for 'legislative history' or with greater care in the making thereof, to guide the courts in interpreting and applying the law." [22]

In both the House and Senate, it was explained that a civil action could not be brought without *efforts* to achieve voluntary compliance by conciliation. The House Labor Committee Report explained that "maximum efforts be concentrated on informal and voluntary methods of eliminating unlawful employment practices before commencing formal procedures." Representative Lindsay, then a member of the House Judiciary Committee, explained that "the procedures are carefully spelled out. \* \* \* Those procedures are designed to give due protection to everyone. They command that there first be voluntary procedures." [23] He added that "unless this voluntary procedure is complied with, nothing further can happen." [24]

On at least two occasions Congress thoroughly considered and then rejected proposals that litigants be permitted to proceed with court action before conciliation was attempted. Thus, the original bill expressly provided that a civil action could be brought "in advance" of conciliation efforts "if circumstances war-

rant," but these clauses were eliminated "to make certain" that there be resort "to conciliatory efforts" before court action.[25]

The bill was passed by the House as amended and the amendment, eliminating the "in advance" clause, was explained by Representative O'Hara:

"There were some who believed that perhaps the language, as it stood, would authorize bringing the action in court before any attempt had been made to conciliate. We thought that striking the language would make it clear that an attempt would have to be made to conciliate in accordance with the language \* \* \* before an action could be brought in the district court." [26]

Further evidence of intent is found in the fact that in 1965 Congress again was urged to enact a law which would permit litigation "in advance" of conciliation.[27] Again Congress rejected this proposal. It seems to me perfectly clear that the plaintiffs are here seeking by court decree to acquire precisely that which legislative proponents sought and failed to get from the Congress.

The plaintiffs concede in their brief that conciliation efforts were a prerequisite to a civil action under the bill as passed by the House. But they argue that the conciliation prerequisite was eliminated by the Dirksen compromise in the Senate. To support this argument they point to the fact that the compromise substituted the "person aggrieved" for the Commission as the party authorized in the original proposal to bring the civil action. This argument is in "patent disregard for the fact that the procedure under the compromise was explained [in the Senate], just as was the House Bill, as authorizing the institution of a civil action only after concilia-

21. The Civil Rights Act of 1964, 78 Harv. L.Rev. 684, 693 (1965).

22. Vaas, Title VII; Legislative History, 7 Boston College L.Rev. 431, 444 (1966).

23. 110 Cong.Rec. 1638, 2565 (Feb. 1, 8, 1964).

24. 110 Cong.Rec. 2565 (Feb. 8, 1964).

25. 110 Cong.Rec. 2566, 2576 (Feb. 8, 1964) (Rep. Celler, Chairman of the House Judiciary Committee).

26. 110 Cong.Rec. 2566 (Feb. 8, 1964).

27. House Rep. No. 718 on H.R. 10065, 89th Cong., 1st Sess., 1965.

tory efforts by the Commission.[28] As to the conciliation step, it was explained in the Senate:

"[W]e have leaned over backwards in seeking to protect the possible defendants by means of all the procedures referred to—those of conciliation, arbitration, and negotiation." [29]

"If efforts to secure voluntary compliance fail, the person complaining of discrimination may seek relief in a federal district court." [30]

Senator Saltonstall explained his support of the proposed legislation as follows:

"[A]n aggrieved party may initiate action under the provisions of the bill on a federal level. In such cases, provision is made for Federal conciliation in an effort to secure voluntary compliance with the law *prior to court action.*

"The point of view of this section is to permit one who believes he has a valid complaint to have it studied by the Commission and settled through conciliation if possible. The Court procedure can follow.

"In Massachusetts, we have had experience with an arrangement of this sort for 17 years and as I recall, approximately 4,700 unfair practice complaints have been brought before our Massachusetts Commission Against Discrimination. Only two of them have been taken to court for adjudication. That procedure is the basis and theory of this part of the bill and that is why I support it." [31] (Emphasis above supplied.)

Senator (now Vice President) Humphrey made the following statements:

"Those of us who have worked upon the substitute package have sought to simplify the administration of the bill * * * in terms of seeking a solution by mediation of disputes, rather than forcing every case before the Commission or into a court of law.

"We have placed emphasis on voluntary conciliation—not coercion.

"The amendment of our substitute leaves the investigation and conciliation functions of the Commission substantially intact.

"Section 706(e) provides for suit by the person aggrieved *after conciliation has failed."* (Emphasis supplied.)[32]

The plaintiffs ignore the legislative history relating to the compromise between the Senate and the House and the adoption of the legislation in its present form. All of this history was relied upon by Chief Judge Lynne in the *Dent* case,[33] and I cannot overlook the fact that this court heretofore indicated approval of *Dent* in Mickel v. South Carolina State Employment Service, 377 F.2d 239, 242 (4 Cir. 1967), in which decision two of the judges in the instant cases joined. We there stated:

"The decision in *Dent,* supra, * * painstakingly discusses the legislative history of this portion of the Civil Rights Act. The opinion presents overwhelming authority culled from Congressional committee reports and the statements of key legislators to support the conclusion that Congress intended that persons claiming discrimination in employment should first exhaust their remedies within the Commission created for that purpose. Furthermore, the original bill contained a clause permitting the bringing of civil actions prior to seeking conciliation but this provision was eliminated by a House amendment in order to insure that conciliatory efforts would be made."

---

28. Dent v. St. Louis-San Francisco Ry. Co., 265 F.Supp. 56, 59–60 (N.D.Ala. 1967).

29. 110 Cong.Rec. 14190 (June 17, 1964) (Senator Morse).

30. 110 Cong.Rec. 12617 (June 3, 1964) (Senator Muskie).

31. 110 Cong.Rec. 12690, 14190 (June 4, 17, 1964).

32. 110 Cong.Rec. 13088, 14443, 12722–12723 (June 4, 9, 1964).

33. Dent v. St. Louis-San Francisco Ry. Co., 265 F.Supp. 56 (N.D.Ala.1967).

I again express my approval of the decision in *Dent* and its analysis of the legislative history. That decision was relied upon heavily by the court below. Now, the plaintiffs incorrectly assert that most of the items of legislative history relied upon by the district court and by the court in the *Dent* case were from the House "at a time when the bill still provided for judicial enforcement only at the suit of the Commission," a provision in the bill as originally drafted. It would appear that the statements from the Senate as hereinabove set forth demonstrate that the arguments advanced by plaintiffs are without merit. It cannot be doubted that the Dirksen compromise was "a further softening of the enforcement provisions of Title VII," [34] and placed "greater emphasis * * * on arbitration and voluntary compliance than there was in the House bill." [35] Senator Case, a co-manager of the bill in the Senate, stated:

> "There could be no claim of harassment in as much as the enforcement procedure has been whittled down to the minimum." [36]

Therefore, it would be illogical to construe the compromise as placing less emphasis on voluntary compliance than did the House bill.

The plaintiffs' argument that the Dirksen compromise in the Senate was intended to permit suit prior to conciliation efforts, thereby reversing the procedure admittedly spelled out in the House bill, is illogical in two more respects. First, the compromise grew out of the need of the supporters of the bill in the Senate to invoke the cloture procedure. In order to obtain the requir-

ed number of votes the House bill had to be softened. "The necessity for and difficulties in obtaining the two-thirds vote for cloture must be borne in mind in any attempt to understand the amendments to the bill adopted in the Senate and particularly the amendments to Title VII.[37] Second, if it had been the intent of the Senate to allow resort to court action prior to conciliation efforts, this could easily have been accomplished by reinserting the "in advance thereof" clause which was deleted in the House. The Senate, however, made no such insertion and, even more to the point, there are no statements from the Senators to indicate that the Senate bill was to be construed as if the "in advance thereof" clause had been inserted. It having been the recognized intent of the House to insure conciliation efforts before resort to court action it would be contrary to logic to imagine that this intended procedure was eliminated in the Senate by inference and without one word of explanation. Thus, when the Senate bill went back to the House for approval, it was explained by members of the House Judiciary Committee that:

> "There is greater emphasis in the Senate amendments on arbitration and voluntary compliance than there was in the House bill." [38]

> "The bill comes back to the House tempered and softened." [39]

Adverting to the Senate proceedings, it was pointed out that the compromise proposal was based upon the accumulated experience of twenty-five states which have fair employment practices laws. Senator Javits assured the Senate that fears about the procedure of the compro-

34. 110 Cong.Rec. 12595 (June 3, 1965) (Senator Clark).

35. 110 Cong.Rec. 15876 (July 2, 1964) (Rep. Lindsay).

36. 110 Cong.Rec. 13081 (June 9, 1964); and Senator Humphrey stated that the Senate changes "gave increased emphasis to methods of securing voluntary compliance." 110 Cong.Rec. 12707 (June 4, 1964); and "We have placed emphasis upon voluntary conciliation—not coercion." 110 Cong.Rec. 14443 (June 19, 1964).

37. Berg, Equal Employment Opportunity Under The Civil Rights Act of 1964, 31 Brooklyn L.Rev. 62, 66 (1964).

38. 110 Cong.Rec. 15876 (July 2, 1964) (Rep. Lindsay).

39. 110 Cong.Rec. 15893 (July 2, 1964) (Rep. McCulloch).

mise were not warranted because "in the 13 industrial states of the north, since the first law of this kind was passed, there have been 19,439 cases" and "only 18 have actually gone to court." (110 Cong.Rec. 13089–13090, June 9, 1964). As hereinbefore shown, Senator Saltonstall referred to the experience in Massachusetts as gratifying, indeed. The Senate obviously relied heavily upon such assurances that employers would not be harassed with frivolous litigation and that the federal courts would not be flooded.

The experience of the states, showing that conciliation is a successful means of obtaining voluntary settlement of complaints of discrimination in employment, is not to be lightly regarded. This court has already recognized that conciliation provides a means for the Commission to settle the matter "in an atmosphere of secrecy without resorting to the extreme measure of bringing a civil action in the congested federal courts," *Mickel*, supra, 377 F.2d 239, 241. The statute, § 706(a), 42 U.S.C. § 2000e–5(a), directs that nothing said or done and as a part of "such endeavors" may be made public by the Commission without the written consent of the parties or used as evidence in a subsequent proceeding. This section also makes it a misdemeanor for any employee of the Commission to divulge such information. If voluntary compliance with these statutes is the first objective, and I think it is, the prospect of willing cooperation is greatly diminished by a suit instituted prior to conciliation efforts on the part of the Commission. Publicity with respect to complaints of discrimination might involve substantial dangers to industrial peace. The pressures, publicity and adversary attitudes which naturally follow the institution of a law suit can make willing cooperation difficult, if not impossible. Congress intended, in my view, that the Commission should make the effort to eliminate alleged unlawful employment practices by conferences with the employer, by persuasion and by conciliation. Such is the sensible approach before au-

thorizing the aggrieved person to plunge into litigation. I am persuaded that it is this approach which Congress intended and for which it made provision.

It is true that the courts are not in accord in their interpretation of these statutes, as pointed out in the majority opinion. As these disagreements began to appear the Commission may have been impelled to review and reconsider the procedures which it had undertaken to follow. In the instant cases the notification was sent to each plaintiff that he could resort to court action prior to any conciliation effort by the Commission. Up to that time the Commission had issued no formal or official interpretation of the requirements of the statute with regard to whether an effort to conciliate must precede the issuance of such notice. But in November 1966 the Commission, perhaps entertaining some doubt as to the legality of its procedure employed in these and other cases, issued a Regulation stating that it "shall not issue a notice * * * where reasonable cause has been found, prior to efforts at conciliation with respondent," except that, after sixty days from the filing of the charge, the Commission will issue a notice upon demand of either the charging party or the respondent. (29 C.F.R. § 1601.25a).

If inability to undertake conciliatory procedures be attributable solely to a "heavy case load," as asserted by the Commission, this would not be the first instance where statutes could not be followed or enforced because of lack of necessary implementation. If sufficient funds were not appropriated to permit the Commission to function as intended this situation can and should be corrected, but this is a problem which cannot be solved by the courts. Claims of resulting unfairness to allegedly aggrieved persons have been made in this and other courts if conciliation effort, though unsuccessful, is held to be a prerequisite to resort to the courts. It is clear that Congress intended to protect aggrieved persons against violations of their civil rights but it is clear also that Congress

did not lose sight of the unfairness which would result to parties against whom charges are filed if they could be brought into court without the conciliation step.[40]

40.  See Dent v. St. Louis-San Francisco Ry. Co., 265 F.Supp. 56, 62 (N.D.Ala.1967).